Jacob M. Faircloth, Esq. (SB No. 305390)
BLUESTONE FAIRCLOTH & OLSON, LLC
1825 Fourth Street
Santa Rosa, CA 95404
Telephone: (707) 526-4250
Email: jacob@bfolegal.com
Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SANTA ROSA DIVISION

In Re

MARIA ELENA HIGGINBOTTOM and
HOLLIS DALE HIGGINBOTTOM,

Debtors.
_____/

MARIA ELENA HIGGINBOTTOM and
HOLLIS DALE HIGGINBOTTOM,

Plaintiffs,

v.

MCLP ASSET COMPANY, INC., and
SELENE FINANCE, LP,

Defendants.
_____/

Case No. 24-10650-DM
(Chapter 13)

A.P. No. 25-01004

**FIRST AMENDED COMPLAINT**

Maria Elena Higginbottom and Hollis Dale Higginbottom, the Chapter 13 Debtors in the above-captioned case (the "Debtors" or "Plaintiffs"), allege as follows:

**I.**

**PARTIES**

1. Defendant MCLP Asset Company, Inc., is a Delaware corporation, that is registered to do business in the State of California. It may be served with process via first-class mail sent to its agent for service of process CT Corporation System, 330 N Brand Blvd, Suite 700, Glendale, CA 91203. It will also be served with process via first-class mail sent to its attorney of record in this case, Christopher Giacinto, at Padgett

**FIRST AMENDED COMPLAINT** - Page 1

Law Group, 6267 Old Water Oak Road, Suite 203, Tallahassee, FL 32312.

2. Defendant Selene Finance, LP., is a Delaware Limited Partnership ("Selene"), that is registered to do business in the State of California. It may be served with process via first-class mail sent to its agent for service of process CSC - Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833.

3. The Plaintiffs are the Chapter 13 Debtors in the above-captioned case.

## II.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157. Furthermore, this is a "core" proceeding pursuant to 28 U.S.C. § 157(b), pursuant to the October 29, 2024, filing of the Chapter 13 petition of the Debtors commencing Case No. 24-10650-DM. This complaint is brought pursuant to 11 U.S.C. §§ 105, 542, and 704 and Federal Rule of Bankruptcy Procedure 7001. Venue is proper in this court pursuant to 28 U.S.C. § 1409(a). The Plaintiffs consent to entry of a final order or judgment by the bankruptcy court.

## III.

## BACKGROUND FACTS

**A.  The Debtors' Residence and Mortgage.**

5. The Debtors own the real property and improvements located at 389 Bonnie Avenue, Rohnert Park, CA 94928 A.P. No. 143-224-018-000 (the "Property"). The Property is, and has been for many years, the Debtors' principal dwelling.

6. Defendants have a first deed of trust against the Property. As of the petition date, the payoff of the debt secured by the first deed of trust was approximately $268,466.42.

7. In or around July 2023, the Debtors believe they were 1-2 months behind on their mortgage payments to Defendants. Their payments at that time were approximately $1,548/mo, which included an escrow account payment for taxes and homeowners' insurance.

**FIRST AMENDED COMPLAINT** - Page 2

**B.    Issues with Defendants Arise.**

8.  On or about May 1, 2023, Farmers Insurance sent the Debtors a letter advising them that their homeowners' insurance policy would be cancelled on July 30, 2023. Attached hereto as Exhibit A, and, incorporated herein, is a true and correct copy of the letter from Farmers Insurance.

9.  On July 30, 2023, the Debtors' homeowners' insurance was cancelled, but they were unable to find a replacement policy in time.

10. On August 31, 2023, the Debtors received a final notice from Selene, which stated Selene would be placing forced insurance against the property, to be paid via escrow, in the approximate amount of $1,203.36/year, with an effective date of July 29, 2023, with minimum coverage of $229,370. Attached hereto as Exhibit B, and, incorporated herein, is a true and correct copy of this Notice from Selene.

11. Selene subsequently produced Evidence of Insurance (regarding the Forced Insurance), which reflected a monthly premium of $100.28, to expire when cancelled. Attached hereto as Exhibit C, and, incorporated herein, is a true and correct copy of this Notice/Letter from Selene.

12. Sometime around October 23, 2023, Selene performed an Annual Escrow Account Disclosure Statement, which reflected an erroneous homeowner insurance amount of $20,772. Thereafter, Selene improperly changed the monthly payment of $1,548.10 to $3,597.19, with an effective installment increase date of December 1, 2023. It is not clear why Selene used the $20,772 figure instead of the $1,203.36 figure, but this is something that the Debtors have discussed and inquired about with Selene on multiple occasions–both via written correspondence and telephone.

13. Up until Selene erroneously charged $20,772 for homeowners' insurance, the Debtors were behind approximately two monthly payments (aggregating $3,096.20) through November 2023.

14. In November of 2023, the Debtors found alternative replacement homeowners' insurance, with Bamboo Insurance, and the Debtors promptly advised

Selene of the new insurance policy.

15. On November 30, 2023, Selene sent a letter confirming that acceptable insurance coverage had been found. Selene cancelled its forced insurance effective November 22, 2023. Selene stated that there was only an "earned premium" of $378.47 charged to the Debtors' account for the time that the policy was in force, and Selene stated it was issuing a premium refund of $22.65. Attached hereto as Exhibit D, and, incorporated herein, is a true and correct copy of this letter from Selene.

16. Despite the foregoing, Selene continued charging the Debtors the erroneous $20,772 figure with increased installment payments. Additionally, even if the $20,772 charge in October were correct (which it was not, by Selene's own admission), then it should have been substantially reduced when the Debtors found alternative homeowners' insurance, which Selene accepted.

17. On or around December 15, 2023, Selene paid Bamboo Insurance $1,619 for the new insurance policy, which included 1 year of coverage.

18. Despite the foregoing, and despite the erroneous $20,772 figure added to the escrow account, Selene did not adjust the escrow account, it did not adjust Debtors' payments, and it did not refund the Debtors.

19. On or around February 8, 2024, Selene completed another new escrow analysis, which reflected a homeowner insurance amount of $1,619. Effective April 1, 2024, Selene decreased the monthly installment from $3,597.19 back to the $1,533.16 original installment amount.

20. However, Selene did not refund the Debtors the overpayments that had gone to the Escrow account, or correctly reapply the "overage" payments to principal and interest. Instead, Selene kept the substantial and erroneous overpayment in the escrow account that had been paid between December through March (the period of time that Selene erroneously charged $3,597.19/mo, and misapplied payments based on this issue). Selene also began charging substantial late fees, interest, and other charges, in relation to these "missed" payments that they had caused to be created. In reality, the late payments

**FIRST AMENDED COMPLAINT** - Page 4

Case: 25-01004    Doc# 10    Filed: 04/21/25    Entered: 04/21/25 09:01:20    Page 4 of 13

were entirely caused by Selene misapplying the Debtors' payments.

21. As a result of the foregoing issue, Selene misapplied the payments the Debtors' made for many months...Instead of applying the Debtors' payments to principal and interest, Selene first applied the monies that the Debtors were paying to the escrow account, on account of the $20,772 erroneous charge for homeowners' insurance.

22. On July 1, 2024, the Debtors sent a written letter to Selene regarding these issues.

23. On July 2, 2024, Selene filed and recorded a Notice of Default ("NoD"), which asserted $13,376.48 in arrearages. Attached hereto as Exhibit E, and, incorporated herein, is a true and correct copy of the Notice of Default.

24. On September 12, 2024, the Debtors sent a qualified written request to Selene and its attorney, regarding the foregoing issues, which Selene received on October 3, 2024.

25. On October 17, 2024, Selene filed and recorded a Notice of Sale ("NoS").

26. On October 24, 2024, Selene sent a letter responding to the Debtor's 9/12/24 letter, detailing and verifying the above time line and issues–including the escrow analyses. However, despite confirming the time line and verifying the issue, the Defendants failed to address and/or fix these issues. In fact, instead of fixing the issue with the improper charges to the escrow account (which Selene noted in its letter), Selene continued to maintain that the Debtors were 9 months delinquent, with a foreclosure date set for December 2024. Selene did not explain the improper charge for insurance, refund any portion that was being improperly held, or attempt to adjust the incorrect payments and charges for December 2023 through March 2024. Attached hereto as Exhibit F, and, incorporated herein, is a true and correct copy of this Letter from Selene.

27. On October 31, 2024, Selene sent a letter to counsel for the Debtors, which acknowledges an escrow surplus of at least $7,517.21. The letter also states that "[i]n the event that your loan is 30 or more days past due, any overage will be retained." It is unclear what Selene has done with these funds, since the bankruptcy was filed. It is

**FIRST AMENDED COMPLAINT** - Page 5

Case: 25-01004    Doc# 10    Filed: 04/21/25    Entered: 04/21/25 09:01:20    Page 5 of 13

possible that Selene's actions regarding retention of these funds and/or further improper use of these funds constitutes a violation of the automatic stay. Attached hereto as Exhibit G, and, incorporated herein, is a true and correct copy of this letter from Selene.

**C.      The Debtors' Payments to Selene.**

28.     As noted in paragraph 13 hereinabove, the Debtors were two months behind on their payments through November 2023. Otherwise, they did not have issues with making their payments until Selene erroneously increased their payment from $1,548.10 to $3,597.19/mo, effective December 1, 2023. As mentioned above, this was due to Selene erroneously and improperly charging the Debtors $20,772 for forced insurance through their escrow account–a figure which Selene has admitted was incorrect.

29.     On November 30, 2023, the Debtors paid $1,548.10 to Selene–which should have been applied to the October 2023 payment.

30.     On December 1, 2023, Selene improperly increased the payment from $1,548.10/mo to $3,597.19/mo.

31.     On December 13, 2023, the Debtors paid $1,548.10 to Selene–which should have been applied to the November 2023 payment.

32.     On January 13, 2024, the Debtors paid $1,548.10 to Selene–which should have been applied entirely to the December 2023 payment.

33.     On February 14, 2024, the Debtors paid $1,548.10 to Selene–which should have been applied entirely to the January 2024 payment.

34.     At this time, Selene informed the Debtors that they were several months behind. However, in fact, they were barely one month behind. They had just made a payment on February 14, 2023, which should have been applied to their ordinary January payment. But, because Selene had erroneously increased their payment, they were also misapplying their payments to the escrow account (instead of against interest and principal). Because of the ongoing payment issues, and misapplication of payments, charges, and interest, the Debtors did not make any further payments in February or

March. During this time, the Debtors made numerous calls and sent many communications to Selene to try and fix the issue that Selene had caused–to no avail.

35. On April 29, 2024, due to threats of foreclosure, the Debtors paid $7,194.38 to Selene–which should have been applied to their February, March, April and May payments. At this point, the Debtors should have been current on their payments through this date, with adjustments due to any improper charges for late fees, interest, costs, etc.

36. However, Selene did not appropriately apply the April 29 payment of $7,194.38 to the Debtors' account. Instead, $4,831.60 was applied to the escrow account for the erroneous and incorrect $20,772 for forced insurance.

37. These payments and the improper applications of payments to the escrow account are confirmed by Part 5 of the Defendants' Loan Payment History, attached to Defendants' Proof of Claim (see, for example, Page 9 relating to the April 29 payments).

38. At this point, Selene began to commence foreclosure proceedings. The Debtors were unable to "catch-up," because Selene falsely claimed they still owed $4,725.56 through May 2024, for just principal and interest. Of course, this is similar to the amount that Selene incorrectly charged to the escrow account, per paragraph 36 hereinabove.

39. Throughout this entire process, Debtor Maria Higginbottom contacted Defendants more than a dozen times...She urged them to fix this issue and appropriately allocate her payments. During several of her phone calls, employees of Selene acknowledged they had created a substantial issue; however, none of the employees were able to help Ms. Higginbottom or fix and address the issue they had created.

40. Based on the foregoing, the Debtors sought legal counsel, and were unable to make payments for June, July, August, September, or October. The Debtors acknowledge they likely owe approximately $7,665.80 in pre-petition arrears ($1,533.16 for 5 months).

41. Defendants, however, assert arrears of $15,188.21, some of which is due

to improper foreclosure fees and late charges (estimated to be approximately $4,752.14).

**D.      The Debtors' Chapter 13 Case.**

42.     The Debtors filed their Chapter 13 case on October 29, 2024. It was filed largely to stop Selene's improper foreclosure and in order to assist the Debtors in determining why Selene had erroneously and improperly charged them $20,772 for homeowner's insurance.

43.     On October 29, 2024, the Debtors filed their Chapter 13 Plan in this case. The Chapter 13 Plan (the "Plan") provides in Sections 5 and 10–among other things–that the Debtors contested the arrears alleged to be owed by Defendants, and that they intended to object to any claim filed by Defendants, if so improperly filed. [See Chapter 13 Plan, Docket No. 6] Defendants have not objected to the Plan.

44.     On December 27, 2024, the Defendants filed Proof of Claim No. 4, which asserts a claim for $268,466.42. [See Claim No. 4]

45.     Defendants' Claim correctly lists the monthly payment of $1,571.12; however, due to the facts articulated hereinabove, it incorrectly asserts interest due of $7,953.99, fees and costs due of $4,752.14, principal due of $3,465.40, and it fails to account for the overpayment/surplus held in the escrow account (or treated in any way otherwise).

### IV.

### FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS
### BREACH OF CONTRACT
### (11 U.S.C. §§ 105 & 542)

46.     The Plaintiffs reallege the allegations contained in paragraphs 1 through 45 above.

47.     The Deed of Trust provides the following regarding "Escrow Accounts":

> Subject to applicable law, no escrow shall be required except upon written demand by Lender, in which case, I shall pay to Lender on the day payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes, penalties and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance

premiums, if any; and (e) yearly mortgage insurance premiums, if any. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for an escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 es seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow items in accordance with applicable law....Lender shall apply the Funds to pay the Escrow Items...If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to me for the excess Funds in accordance with the requirements of applicable law.

48. Defendants breached their contract with the Debtors when they improperly overcharged Debtors over $20,772 for insurance. The Parties have a valid contract (the Deed of Trust). The Plaintiffs have correctly tendered payments and performed under the Deed of Trust. However, the Defendants have breached this agreement by failing to correctly apply the payments, and overcharging over $20,000 for forced insurance. Defendants have subsequently failed to address this issue and correctly apply the Debtors' payments.

49. Moreover, there is no factual dispute that Defendants improperly increased the Debtors' payments due to an erroneous sum for forced insurance. Selene's own documents and records acknowledge that the forced insurance was only $378.47 for the very short period of time that it was in effect.

50. Nevertheless, Selene erroneously charged the Debtors $20,772 to their escrow account, which has resulted in a 1.5 year nightmare for the Debtors. Because of the improper charge, Selene has failed to properly account for the Debtors payments, which it was required to do under the Note and Deed of Trust...Instead of applying them to interest and principal, Selene has misapplied their payments to the erroneous escrow charge. This has resulted in thousands of dollars in fees, interest, etc., and Selene has acknowledged this issue, but has failed to fix it.

51. Defendants' actions has led to them initiating an improper foreclosure, which ultimately forced the Debtors into bankruptcy. Notably, the NoD and NoS were

FIRST AMENDED COMPLAINT - Page 9
Case: 25-01004    Doc# 10    Filed: 04/21/25    Entered: 04/21/25 09:01:20    Page 9 of 13

based upon incorrect amounts. Had Selene not erroneously charged over $20,000 to Debtors' escrow account, and then misapplied multiple payments thereafter, the Debtors would not have become "delinquent," such that Claimants could initiate foreclosure. Foreclosure was entirely caused by Defendants' misconduct and miscalculations. Importantly, Selene could have fixed this issue on numerous occasions, including appropriately calculating and applying Debtors' payments, which would have reflected foreclosure was not permissible and, in fact, Debtor's should have been current on their payments in April 2024.

52. Additionally, it's not clear what Selene has done with the escrow funds it claims were a "surplus," (by its own admission) all of which arose out of the erroneous charge of $20,772. However, the Debtors believe it is likely that Selene has breached its fiduciary duties in handling the escrow funds, in addition to potentially unlawfully converting those funds, as part of its breach of contract.

53. The Debtors are entitled to their damages for the foregoing breaches, in addition to turnover of the surplus, and attorney's fees and costs under the Deed of Trust.

## V.

### SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS
### VIOLATIONS OF THE TRUTH IN LENDING ACT
### (15 U.S.C. § 1639)

54. The Plaintiffs reallege the allegations contained in paragraphs 1 through 52 above.

55. The Truth in Lending Act ("TILA"), which applies to the subject consumer transaction, includes 15 U.S.C § 1639f(a), which requires loan servicers to properly credit payments to consumer loans which are secured by a consumer's principal dwelling.

56. Defendants have failed to properly credit payments to the Debtors' loan, which is secured by their principal dwelling. This failure is also ongoing, as the matter should have been corrected on numerous occasions, and remains to be corrected.

57. The Debtors are entitled to actual damages, statutory damages, attorney's

fees and costs for violations of TILA.

## VI.

## THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS
## VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES ACT
## (12 U.S.C.A. § 2605)

58. The Plaintiffs reallege the allegations contained in paragraphs 1 through 57 above.

59. Various Sections of the Real Estate Settlement Procedures Act ("RESPA"), referenced in the Deed of Trust, apply to the foregoing facts, including the following:

    a.    12 U.S.C. § 2605(g) and (e) require servicers to administer escrow accounts properly, with substantial guidelines, requirements, and remedies. Here, Claimants failed to comply with Section 2605(g), but notably relating to Subsection (e), with regards to responding and correcting issues after receive of a qualified written request.

    b.    12 U.S.C.A. § 2605(g) prohibits unreasonably force-placing hazard insurance. Other bankruptcy courts have found that Chapter 13 debtor-mortgagors have stated a plausible claim against mortgage lender under RESPA dealing with wrongdoing in connection to force-placed insurance by alleging that lender had force-placed unnecessary insurance on mortgage property when debtor already had insurance in place, and by alleging that lender, after being informed of the insurance purchased by debtor, had cancelled the force-placed insurance but not provided refund to debtor for the costs of the force-placed insurance. *In re Llanos*, Bkrtcy.C.D.Cal.2019, 609 B.R. 228. Here, the Claimants erroneously charged nearly $21,000 to the Debtor's escrow account, overstating an increase in forced insurance premium by more than $20,000. The Claimants' actions appear to be an unreasonably force-placing hazard insurance, which is prohibited. Then, Claimants misapplied Debtors' mortgage payments to the erroneous $20,000+ premium, which caused the Debtors to incur fees, interest, and costs.

    d.    12 U.S.C.A. § 2605(k)(1)(C) and (E) require servicers to take timely

action when responding to requests regarding errors about payment allocation, foreclosure avoidance, and other standard duties, in addition to complying with any other obligations found by the Bureau of Consumer Financial Protection. Here, the Debtors made more than a dozen communications to Claimants, urging them to fix the issues they had created. Instead of fixing the issues and appropriately crediting their payments, Claimants doubled down and commenced foreclosure. Moreover, the issues with misapplied payments is now also present in the Claimants Proof of Claim, which reflects that they have still not fixed these issues.

60. The Debtors are entitled to actual damages, statutory damages (including treble damages), attorney's fees and costs for violations of TILA.

## VII.

### FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

61. The Plaintiffs reallege the allegations contained in paragraphs 1 through 60 above.

62. Defendants owed the Debtors a duty of reasonable care within the context of the foregoing facts and the relationship, including the fiduciary relationship relating to the escrow account. Notably, the Defendants had a duty to the Debtors to handle their payments and insurance correctly. It is reasonably foreseeable that improperly handling these payments and charges, especially overcharges for foreced placed insurance, could cause significant emotional distress when it relates to the primary residence of the Debtors.

63. The Defendants breached that duty by improperly applying payments, improperly holding the "surplus" sum in the escrow account, erroneously overcharging for forced insurance, and ultimately initiating foreclosure–among other things. The Defendants actions are beyond negligent, given that it has acknowledged its mistake, but completely and totally failed to rectify it. And, instead of fixing its mistakes, it has initiated foreclosure and set a sale date, which was only stopped due to this bankruptcy case.

63. The breach of this duty has caused the Debtors to suffer substantial emotional distress, and is exclusively tied to the Defendants misconduct. This has been a nightmare spanning over a year. For example, the Debtors have had many sleepless nights, and the erroneous attempt and threat of foreclosure has manifested itself in physical ways for the Debtors beyond just worry and concern, including nausea, trouble sleeping, impacting their eating, stress, doctor visits, and so on.

## VIII.

## REQUEST FOR RELIEF

WHEREFORE, the Plaintiffs request that the Court:

1. Award the Plaintiffs judgment against the Defendants for Defendants' breach of contract, including an award for turnover of the subject "surplus" held by Defendants, reduction of all improper fees/costs charged to the Debtors' account to zero dollars, other actual damages to be determined at trial, statutory damages, and attorney's fees and costs;

2. Award the Plaintiffs judgment for Defendants' violations of TILA, including an award for actual damages to be determined at trial, statutory damages, and attorney's fees and costs for these violations;

3. Award the Plaintiffs judgment for Defendants' violations of RESPA, including an award for actual damages to be determined at trial, statutory damages, and attorney's fees and costs for these violations;

4. Award the Plaintiffs judgment for Defendants' negligent infliction of emotional distress, including an award of damages relating thereto; and

5. Grant the Plaintiffs such other and further relief, at law or in equity, to which the Plaintiffs may be justly entitled.

DATED: April 21, 2025                BLUESTONE FAIRCLOTH & OLSON, LLP

                                     */S/ Jacob M. Faircloth*
                                     By_____
                                        Jacob M. Faircloth
                                     ATTORNEY FOR PLAINTIFFS/DEBTORS